In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1131

C.A. Brokaw,

Plaintiff-Appellant,

v.

Mercer County, James Brokaw,
Weir Brokaw, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 97 C 4011--Joe Billy McDade, Chief Judge.

Argued September 16, 1999--Decided December 19, 2000

Before Ripple, Manion, and Diane P. Wood, Circuit
Judges.

Manion, Circuit Judge.  In July 1983, when he was
six years old, C.A. Brokaw and his three-year-old
sister were forcibly removed from their parents'
home in Mercer County, Illinois. After he turned
eighteen, C.A. filed suit against his grandfather
and aunt, who he contends conspired with his
uncle, a Deputy Sheriff of Mercer County, to
violate his constitutional rights. C.A. also sued
the social worker and other officers involved in
removing him from his home, along with the state
judge who presided over various hearings.
Additionally, the suit named Mercer County and
the State of Illinois (although the State of
Illinois is no longer a party to the case). After
allowing C.A. to amend his pro se complaint, the
district court dismissed the complaint for
failure to state a claim. Brokaw appeals. We
reverse as to all defendants except the presiding
judge and Probation Officer Hansen.

I.  Factual Background

   Because this case comes to us from a 12(b)(6)
dismissal, we assume that the facts alleged in
the complaint are true, and read those facts, and
all reasonable inferences flowing from those
facts, in the light most favorable to C.A.
Bethlehem Steel Corp. v. Bush, 918 F.2d 1323,

1326 (7th Cir. 1990). In determining whether C.A. failed to state a claim, we also consider any additional consistent facts presented by C.A. on appeal. Albiero v. City of Kankakee, 122 F.3d 417, 419 (7th Cir. 1997). With this in mind, we go back in time to 1983.

In early July of that year, the plaintiff's father, Dennis Brokaw, who had recently been released from the hospital and who was still recuperating, was invited by his sister, Karen Weaver, and their father, Weir Brokaw, to Weir's home. The invitation specifically excluded Dennis' wife, Bonnie, and their children, the plaintiff C.A. and C.A.'s sister. As it turned out, they were excluded because Karen and Weir were attempting to convince Dennis to leave his family. During the next few days, Weir and Karen brought intense pressure on Dennis to leave his family and to obtain a divorce because they objected to Dennis and his family's religious beliefs and practices. Dennis refused. Soon thereafter, on the evening of July 5, 1983, there was a confrontation between C.A.'s parents and Weir Brokaw and Karen Weaver, during which C.A.'s parents expressed their "vehement repugnance" of Weir and Karen's attempts to split the family apart.

The next morning Weir and Karen, along with James Brokaw (Weir's son and Dennis and Karen's brother and, significantly, a Deputy Sheriff for Mercer County) conspired in a plan to end the marriage. Together, in response to the previous evening's confrontation and because they disagreed with Dennis and Bonnie's religious beliefs, James, Karen and Weir decided to file "baseless and scurrilous"/1 claims of child neglect. They believed that this would cause C.A. and his sister to be removed from their parents' home, and in turn prompt Dennis to divorce his wife and leave his family. To further this plan, they enlisted the help of the Sheriff of Mercer County, Marvin Thirtyacre, and "fabricated concerns about the welfare of Plaintiff and his sister."

At about noon that same day (July 6, 1983), Sheriff Thirtyacre contacted Penny Ingersoll, who was a caseworker for the Department of Children and Family Services, and arranged a meeting for later in the afternoon. Thirtyacre, Weir, James and Karen met with Ingersoll briefly outside the courthouse in Aledo, Illinois, and a few minutes later Judge Susan Gende joined them. During this meeting, Thirtyacre, Weir, James and Karen allegedly made allegations of child neglect to cause the DCFS to remove C.A. and his sister from their home.

According to C.A., although Judge Susan Gende attended this meeting, she did not issue a court order concerning the children's custody. Nonetheless, at dusk that evening, two men walked into C.A.'s home, grabbed C.A. and his three-year-old sister, and carried the crying children out of their home. C.A.'s parents chased the intruders while repeatedly demanding that they identify themselves and explain what was happening. The men refused, one shouting: "We don't have to tell you a damn thing!" C.A. believed he was being kidnaped and was going to be killed. His parents also believed that their children had been kidnaped, and they called the police. (They later learned that their children were removed based on the alleged child neglect.)

The strangers, who were later identified as Deputy Sheriff Jonathon Weakley and Probation Officer James Bartelt, drove C.A. and his sister to a lane that led into a cornfield, where they were met by Deputy Sheriff James Brokaw and Sheriff Martin Thirtyacre. While it is unclear from the record, it appears that from there the children were taken to a foster home where they spent the night.

The next day Sheriff Thirtyacre filed a petition for adjudication of wardship, and the children were ordered to remain in foster care. About one week later, on July 13, 1983, Probation Officer Vickie Hansen picked up C.A. from the foster home and drove him to a courthouse. At the courthouse, Judge Gende and several other of the defendants questioned C.A. about the alleged abuse, and according to C.A., he "was frightened and coerced into answering questions, [and] Defendants attempted to make him say derogatory statements about his parents."

About three weeks later, Judge Gende began presiding over an adjudication hearing. The hearing was continued until August 3, 1983, at which time Judge Gende ordered C.A. and his sister wards of the state, in part based on a social study prepared by Probation Officer James Bartelt. C.A. contends that the report contained false information, and that his parents were denied the opportunity to disprove those allegations because they were not given access to the report until after the hearing and after the court had already made C.A. a ward of the state. After her ruling, Judge Gende allegedly threatened the parents' attorney that if the children's parents appealed her decision of wardship, she would personally see to it that they would not see their children until they were adults, but that if they did not appeal, she would be more inclined to allow the children to return home someday.

It is unclear what, if any, investigation took place or what facts came to light, but on October 28, 1983, almost four months after they were first removed from their home, Judge Gende entered an order permitting C.A. and his sister to return home, finding insufficient evidence that they needed protection. However, it was not until July of 1984--after C.A.'s parents dismissed a federal lawsuit they had filed concerning their children's custody-- that Judge Gende dismissed the order of wardship.

In February 1997, after he had reached the age of majority, C.A. filed a pro se complaint in federal court against Mercer County; Marvin Thirtyacre, the Mercer County Sheriff; James Brokaw, a Mercer County Deputy Sheriff; Weir Brokaw, his paternal grandfather; Karen Weaver, his paternal aunt; the State of Illinois; Penny Ingersoll, a caseworker for the Illinois Department of Children and Family Services; Steve Dickens, a caseworker for the Illinois Department of Children and Family Services; Susan Gende, a state judge in the 14th Judicial Circuit of Illinois; James Bartelt, the Director of the Mercer County Probation Department; Jonathon Weakley, a Mercer County Deputy Sheriff; and Vickie Hansen, a Mercer County Probation Officer. The district court, thinking this late-filed complaint was barred by the statute of limitations, ordered C.A. to show cause why the complaint should not be dismissed. C.A. responded by citing Illinois' tolling statute, which provides that the statute of limitations does not begin to run on a minor's claim until he reaches the age of eighteen. 735 ILSC 5/13-211. The district court then struck the complaint, ordering C.A. to file an amended complaint specifying the legal basis on which it was brought. C.A. complied with the order, and filed an amended complaint under 42 U.S.C. sec. 1983, alleging claims under the First, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendments. C.A. also alleged state law claims of intentional infliction of emotional distress and false imprisonment.

All of the defendants, except Thirtyacre, appeared and filed motions to dismiss. The district court dismissed the federal claims against all of the defendants, including Thirtyacre, for failure to state a claim, or based on sovereign, absolute, or qualified immunity. The district court further stated that because it had dismissed all of C.A.'s federal claims, it was dismissing his state law claims as well. C.A. moved for leave to file an amended complaint, which the district court denied. C.A. appeals./2

II.  Analysis

   On appeal, C.A. contends that the defendants violated and conspired to violate 42 U.S.C. sec.sec. 1983, 1985(3), by depriving him of certain constitutional rights, and that he is entitled to attorney's fees under Section 1988. We first consider the Section 1983 claim.

A.  Section 1983

   In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law. Starnes v. Capital Cities Media, Inc., 39 F.3d 1394, 1396 (7th Cir. 1994). In this case, C.A. alleged that the defendants violated, and conspired to violate, his constitutional rights under the First, Fourth, Fifth, Eighth, Ninth, Tenth, and Fourteenth Amendments. On appeal, however, C.A. presents arguments based on only three constitutional theories: first, he contends that the defendants violated his Fourth Amendment rights by forcibly removing him from his home without cause; second, he asserts that the defendants violated his substantive due process right to familial relations; and third, C.A. argues that the defendants violated his right to procedural due process by denying him fair and constitutionally adequate process both before and after his removal. We consider each theory below, keeping in mind that dismissal is appropriate only if C.A. is unable to present any set of facts consistent with the complaint which would entitle him to recover. Crenshaw v. Baynerd, 180 F.3d 866, 868 (7th Cir. 1999).

   Initially we need to clear up the issue of Eleventh Amendment immunity. On appeal, the Illinois Attorney General's office argues that the claims against Judge Susan Gende and Probation Officers James Bartelt and Vickie Hansen are barred by the Eleventh Amendment to the extent that C.A. is suing those defendants in their official capacities. Federal suits against state officials in their official capacities are barred by the Eleventh Amendment, Gossmeyer v. McDonald, 128 F.3d 481, 487 (7th Cir. 1997), but on appeal C.A. contends that we should construe his claims against Gende, Bartelt and Hansen as individual capacity claims. Because the state defendants have treated C.A.'s suit as an individual capacity claim--as demonstrated by their assertion of the defense of qualified immunity--we will too. Stevens v. Umsted, 131 F.3d 697, 707 (7th Cir. 1997) (explaining that while a suit against a government official will

be assumed an official capacity suit, that assumption is negated if the parties have treated it as an individual capacity suit by asserting the defense of qualified immunity). An individual capacity suit is not barred by the Eleventh Amendment, so C.A.'s individual capacity claims against Judge Gende and Probation Officers Bartelt and Hansen remain. Gossmeyer, 128 F.3d at 487./3 That said, we move on to the three legal theories presented, beginning with the Fourth Amendment.

1.  Fourth Amendment

The Fourth Amendment, incorporated by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, . . ." U.S. Const., amend. IV. C.A. contends that the defendants violated, and conspired to violate, his Fourth Amendment rights when they forcibly removed him from his home on July 6, 1983.

To determine whether C.A. stated a cause of action under the Fourth Amendment, we must determine whether the defendants' alleged conduct constituted a seizure and if so, whether the seizure was unreasonable in light of the factual allegations./4 Donovan v. City of Milwaukee, 17 F.3d 944, 948 (7th Cir. 1994). "[A] person has been 'seized' within the meaning of the Fourth Amendment . . . if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). In this case, C.A. claims that he was physically carried out of his home, placed in a car, and driven away from his family. Under these circumstances, a reasonable person would believe that he was not free to leave, and thus a "seizure" occurred within the meaning of the Fourth Amendment.

"Of course, . . . seizure alone is not enough for sec. 1983 liability; the seizure must be unreasonable." Donovan, 17 F.3d at 949 (internal quotations omitted). However, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," and "its proper application requires careful attention to the facts and circumstances of each particular case." Graham v. Connor, 490 U.S. 386, 396 (1989). Accordingly, we must consider C.A.'s allegations in light of the specific circumstances at issue, namely the removal of a child from his home based on allegations of child neglect.

In the context of removing a child from his home

and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers "'have reason to believe that life or limb is in immediate jeopardy.'"/5 Tenenbaum, 193 F.3d at 605 (quoting Good v. Dauphin County Social Services for Children and Youth, 891 F.2d 1087, 1094 (3d Cir. 1989)). See, e.g., Tenenbaum, 193 F.3d at 603-05 (analyzing child's removal as a seizure under the Fourth Amendment, and considering whether a court order, probable cause or exigent circumstances justified the child's removal); Wooley v. City of Baton Rouge, 211 F.3d 913, 925-26 (5th Cir. 2000) (noting that a warrant, probable cause, or a reasonable belief that a child is in imminent harm is necessary to justify a seizure of a child under the Fourth Amendment); J.B. v. Washington County, 127 F.3d 919, 929 (10th Cir. 1997) (applying probable cause standard to removal of child); Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000) ("state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse"). Cf. Landstrom v. Illinois Dept. of Children and Family Serv., 892 F.2d 670, 676 (7th Cir. 1990) (search or seizure of child by DCFS must be "reasonable," but that does not necessarily require probable cause or warrant); Darryl H. v. Coler, 801 F.2d 893, 902 (7th Cir. 1986) (accord). Of course, even then the manner in which the seizure is carried out must be reasonable. Tennessee v. Garner, 471 U.S. 1, 8 (1985) ("reasonableness depends on not only when a seizure is made, but also how it is carried out").

In light of these general principles and C.A.'s allegations, we consider the reasonableness of C.A.'s seizure. First, C.A. contends that he was removed from his home without a court order authorizing his seizure, and that it was not until the next day that a petition for adjudication of wardship was filed with the court. Assuming these facts are true, C.A.'s seizure cannot be justified by a court-ordered pickup. That still leaves the possibility that C.A.'s removal was justified by probable cause or exigent circumstances. See supra at 10. However, all we know at this stage is that C.A.'s aunt, grandfather, and uncle (who, remember, as a deputy sheriff is a state actor) told the DCFS and the Sheriff's office something which set in motion C.A.'s removal that same evening, and that the removal occurred without any further investigation into the allegations of child neglect--not even a home visit, or a conversation with C.A. While in rare circumstances allegations

of neglect may be so credible and severe that they justify a pre-investigation and pre-hearing removal, without knowing the details of the alleged neglect, under the alleged facts before us, we cannot conclude that exigent circumstances justified C.A.'s removal. See, Darryl H., 801 F.2d at 903 n.8 (not every report of child neglect constitutes exigent circumstances). See also, Wooley, 211 F.3d at 926 (statements made to police casting doubt on mother's fitness insufficient to create reasonable belief that the child was in danger of imminent harm so as to justify removal, especially in light of the child's apparent safety at his home); Wallis v. Spencer, 202 F.3d 1126, 1138 (9th Cir. 2000) ("[T]he police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been--or will be--committed."); id. ("Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and nature of the allegations."); Croft v. Westmoreland County Children and Youth Serv., 103 F.3d 1123, 1127 (3d Cir. 1997) (allegations of neglect insufficient to establish as a matter of law that caseworker had reasonable grounds to believe that a child was in imminent danger so as to justify removal without court order). Nor can we conclude that the unspecified allegations of neglect against C.A.'s parents established probable cause justifying C.A.'s removal. Because the allegations fail to establish the reasonableness of C.A.'s seizure as a matter of law, we must conclude at this juncture that C.A. has stated a claim under the Fourth Amendment.

Even if a court order directed C.A.'s removal, or exigent circumstances or probable cause justified C.A.'s seizure, the manner in which the defendants seized C.A. may still make his seizure unreasonable. As the Supreme Court stated in Tennessee v. Garner, 471 U.S. 1, 8 (1985), the Fourth Amendment's guarantee of reasonableness "depends on not only how a seizure is made, but also how it is carried out." More recently, the Court explained in Graham v. Connor, 490 U.S. 386, 397 (1989), that the manner in which a seizure occurs must be analyzed under the Fourth Amendment's objective reasonableness standard.

Applying the objective reasonableness standard here, we conclude that C.A. has stated a Fourth Amendment claim premised on the manner in which the defendants allegedly seized him--dressing in plain clothes, driving an unmarked car, entering his home in the evening without knocking or identifying themselves, and then refusing to do so when asked. Most significantly, they abruptly removed the screaming children from the home

without explanation. In effect they acted like kidnappers rather than law enforcement officers. Cf. Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991) (it was not objectively reasonable for a police officer to enter the dark hallway in the entrance of a private residence at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat); Jacobs v. City of Chicago, 215 F.3d 758, 770 n.5 (7th Cir. 2000) (complaint stated a cause of action under the Fourth Amendment where allegations failed to justify a "no-knock" entry of plaintiff's apartment by breaking through door).

Finally, we note that to the extent the defendants knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause, C.A.'s removal from his home, they violated the Fourth Amendment. Malik v. Arapahoe County Dept. of Social Services, 191 F.3d 1306, 1315 (10th Cir. 1999) (government officials' procurement of a court order to remove children based on information they knew was founded on distortion, misrepresentation and omission, violated the Fourth Amendment).

Up to this point, we have treated the defendants together, questioning only whether C.A. stated a Fourth Amendment claim. However, we cannot stop there because "[t]o establish personal liability in a sec. 1983 action, the plaintiff must show that the government officer caused the deprivation of a federal right." Luck v. Rovenstine, 168 F.3d 323, 327 (7th Cir. 1999) (internal quotation omitted). Thus, we must determine which of the defendants caused--and are therefore liable for--any alleged Fourth Amendment violations.

An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights. Morris v. Dearborne, 181 F.3d 657, 672 (5th Cir. 1999). Therefore, "[a]n official satisfies the personal responsibility required of sec. 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985) (internal quotation omitted).

Against this backdrop, we consider each defendant's participation in the seizure of C.A. The easiest case concerns Probation Officer Bartelt and Deputy Sheriff Jonathon Weakley,/6

who C.A. contends physically removed him and his sister from their home. Because these two defendants actually seized C.A., the Fourth Amendment claims against them are clearly proper. Also straightforward is the claim against Deputy Sheriff James Brokaw, who joined in the seizure of the children at the cornfield where C.A. was taken immediately after he was snatched from his home. Because he also participated in the seizure, the Fourth Amendment claim against him stands as well./7

The claim against Sheriff Thirtyacre is a little more complicated, not because of the seizure issue--he was also involved at the cornfield--but because in his complaint C.A. alleged that Marvin Thirtyacre "was acting in his official capacity under color of state law." Thus, C.A.'s suit is not really against Thirtyacre, but against the governmental entity he represents, which in this case is the Mercer County Sheriff's Office. Franklin v. Zaruba, 150 F.3d 682, 684 n.2 (7th Cir. 1998). However, the Mercer County Sheriff's Office is not automatically liable for the acts of its employees. Luck, 168 F.3d at 325. Therefore, we must determine whether the Mercer County Sheriff's Office--as opposed to Thirtyacre personally--caused C.A.'s constitutional deprivation.

A municipality violates the Constitution when it has an unconstitutional custom or policy. Id. A "custom" or "policy" can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995). In this case, C.A. contends that the Sheriff of Mercer County participated in his unconstitutional seizure, along with two other Deputy Sheriffs. We have previously held that a sheriff in Illinois has "final policy-making authority," Ryan v. County of DuPage, 45 F.3d 1090, 1092 (7th Cir. 1995), and that a "custom or policy" may be established by "an allegation that the constitutional injury was caused by a person with 'final policymaking authority.'" McTigue, 60 F.3d at 382. See also, Baxter by Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 735 (7th Cir. 1994) ("It is true that a single act or decision of a final policymaker can establish municipal policy."). Therefore, C.A.'s allegations that Sheriff Thirtyacre participated in his seizure are sufficient at this stage for C.A. to state a claim against the Mercer County

Sheriff Department./8

To further complicate matters, C.A. also sued Mercer County, alleging that the defendants' actions were consistent with the policy, custom, and usage of Mercer County, and that therefore Mercer County is also liable under Section 1983 for the alleged Fourth Amendment violations. This complicates things because it is unclear whether the Sheriff and the Deputy Sheriffs involved in C.A.'s seizure were acting on behalf of Mercer County and/or the Mercer County Sheriff's Office. We have struggled with the appropriate defendant in such a case, see Ryan v. County of DuPage, 45 F.3d 1090 (7th Cir. 1995); Franklin v. Zaruba, 150 F.3d 682 (7th Cir. 1998); DeGenova v. Sheriff of DuPage County, 209 F.3d 973 (7th Cir. 2000), and unfortunately are unaided by the defendants./9 Because at this stage (based on C.A.'s allegations) we cannot determine on whose behalf the Sheriff and Deputies were acting, we remand the claims against Mercer County and the Mercer County Sheriff's Office for the district court to further consider which entity is the appropriate defendant.

Next we consider defendant Penny Ingersoll, who was a DCFS caseworker involved in C.A.'s removal. While Penny was not present during the actual seizure of C.A., the allegations read in the light most favorable to C.A. indicate that she directed those who removed the children to do so. That is enough to affix liability. Ryan v. Mary Immaculate Queen Ctr., 188 F.3d 857, 859 (7th Cir. 1999) (holding that allegations that a supervisor directed the unconstitutional search is enough to affix liability). See also, Morris, 181 F.3d at 672 (defendant who was moving force behind the removal of children was responsible for causing allegedly unconstitutional removal).

Ingersoll responds by arguing that she acted only after having received three complaints of alleged neglect, and that she did not have a constitutional obligation to investigate those complaints. However, that argument begs the question of whether the complaints she received were legally sufficient to justify the immediate pre-hearing removal of C.A. We do not know the nature of the allegations of child neglect, whether or not the allegations of neglect could be easily verified or negated, or whether the alleged neglect created an imminent risk to the children. Without knowing these details, we cannot conclude at the pleadings stage that Ingersoll could reasonably believe that an immediate pre-investigation, pre-hearing removal of C.A. was reasonable./10

While C.A. presented sufficient facts to create

an inference that Ingersoll caused his alleged constitutional deprivation, he did not do so for Probation Officer Vicki Hansen. In his complaint, C.A. merely alleged that Probation Officer Hansen conspired with the other defendants to violate his constitutional rights. That allegation, however, is insufficient to put Hansen on notice of the gravamen of C.A.'s complaint. And while the federal rules of notice pleading do not require the plaintiff to allege all of the relevant facts, "[f]or fair notice to be given, a complaint must at least include the operative facts upon which a plaintiff bases his claim." Kyle v. Morton High. Sch., 144 F.3d 448, 455 (7th Cir. 1998). C.A.'s sole allegation that Hansen conspired with the other defendants is insufficient to put her on notice of C.A.'s complaint against her. While C.A.'s allegations against the other defendants were also meager, they were sufficient to meet the minimal notice pleading standards. Moreover, C.A. presented numerous additional consistent facts on appeal concerning the other defendants' involvement in his seizure, and showing their responsibility for his allegedly unconstitutional seizure. But all C.A. adds on appeal to Hansen is that she was present during a conference in which C.A. was questioned by Judge Gende and several of the other defendants./11 Hansen's mere presence at this conference is insufficient to create a reasonable inference that Hansen had a meeting of the minds with the other defendants to remove him from his parents based on false claims of child neglect. Kumil v. Racine County, Wis., 946 F.2d 1574, 1580 (7th Cir. 1991) (allegations of conspiracy "must be further supported by some factual allegations suggesting 'meeting of the minds'"). Therefore, even considering the facts added on appeal by C.A., he still fails to state a claim against Hansen.

That leaves Judge Gende. The district court dismissed C.A.'s claims against Judge Gende based on absolute judicial immunity. This common law doctrine shields judges from civil liability for their judicial actions. Tucker v. Outwater, 118 F.3d 930, 932 (2d Cir. 1997). The principle of judicial immunity recognizes that "[a]lthough unfairness and injustice to a litigant may result on occasion, it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." Mireles v. Waco, 502 U.S. 9, 10 (1991). Thus, judges are not liable in civil actions for their judicial acts unless they have acted in the clear absence of jurisdiction. Stump v. Sparkman, 435 U.S. 349, 356-57 (1978). Moreover, a judge will not be

deprived of immunity even if the action was in error, was done maliciously, was in excess of his authority, id., and even if his exercise of authority is flawed by the commission of grave procedural errors. Id. at 359.

C.A. attempts to overcome judicial immunity by arguing that Judge Gende's actions were extrajudicial and thus beyond the protection of judicial immunity, relying on Buckley v. Fitzsimmons, 509 U.S. 259 (1993). In Buckley, the Supreme Court held that when a prosecutor performs investigative--as opposed to judicial-- functions, he is acting extrajudicially and thus is not entitled to absolute judicial immunity. Id. at 273. C.A. attempts to cast Judge Gende's involvement in his removal in a similar light. First, he points to Judge Gende's participation in the initial meeting with Sheriff Thirtyacre, Weir, Karen and DCFS Agent Ingersoll outside the Aledo courthouse, claiming that at this point she was not acting as a judge, but rather as a social worker. Next, he cites Judge Gende's questioning of him on July 13 to show that she was acting outside her judicial role. However, under Illinois law, a judge may partake in an informal conference in child custody matters, Ill. Rev. Stat. Ch. 37, para. 703-8 et seq. (1983), and therefore we cannot conclude Judge Gende was acting in the clear absence of jurisdiction by participating in these conferences. See, e.g., J.R. v. Washington County, 127 F.3d 919, 925 (10th Cir. 1997) (judge did not abandon impartial judicial role by having ex parte communication with social worker); Newman v. State of Ind., 129 F.3d 937, 941 (7th Cir. 1997) (holding that judge acted within the outer bounds of his jurisdiction when he ordered parents to remain in courtroom pending the removal of their children from their home); Dellenbach v. Letsinger, 889 F.2d 755, 761 (7th Cir. 1989) (telephone call from trial judge to appellate judge was judicial act not outside scope of immunity). Nor do C.A.'s allegations that Judge Gende joined the conspiracy alter the outcome. See John v. Barron, 897 F.2d 1387, 1393 (7th Cir. 1990) (mere allegations of conspiracy insufficient to overcome judicial immunity). Accordingly, she is absolutely immune from suit.

Still remaining are C.A.'s claims against Weir Brokaw and Karen Weaver for conspiracy to violate his Fourth Amendment rights. While a private citizen cannot ordinarily be held liable under Section 1983 because that statute requires action under color of state law, if a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability. Bowman v. City of Franklin, 980 F.2d 1104, 1107 (7th Cir. 1992). "To establish Section 1983 liability through a conspiracy theory, a

plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." Fries v. Helsper, 146 F.3d 452, 457 (7th Cir. 1998) (internal quotation and citations omitted).

In this case, C.A. alleged just such a conspiracy between Weir and Karen, and Deputy Sheriff James Brokaw. Specifically, C.A. asserted that Weir and Karen conspired with James, who was a deputy sheriff, in July 1983 to file false allegations of child neglect in order to cause the DCFS to remove C.A. from his home and to thereby cause C.A.'s parents to divorce, because of the religious beliefs and practices of C.A.'s family./12 While Weir and Karen claim that C.A.'s allegations are too vague to withstand dismissal under 12(b)(6), C.A. has alleged all of the necessary facts: the who, what, when, why, and how. No more is required at this stage.

Weir and Karen also argue that merely filing a report of child neglect with a state actor, even if false, is insufficient to create liability under Section 1983. We have no qualms with Weir and Karen's proposition. But as summarized above, C.A. alleged much more. In short, C.A. alleged facts supporting the reasonable inference that an agreement existed between Weir and Karen and a Deputy Sheriff, i.e. James, to deprive C.A. of his constitutional rights, and that these defendants then jointly acted in furtherance of this conspiracy by reporting the false neglect charges to DCFS Agent Ingersoll, and this set in motion C.A.'s seizure.

Weir and Karen respond by citing cases which hold that a private citizen is not liable under Section 1983 for reporting crimes to the police, or urging the government to prosecute criminal offenses. Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978); Gramenos v. Jewel Comp., Inc., 797 F.2d 432 (7th Cir. 1986); Butler v. Goldblatt Bros., Inc., 589 F.2d 323 (7th Cir. 1978). But those cases are distinguishable because they did not involve an alleged agreement between the police and the private citizens; rather, the private individuals acted independently from the government in making the police reports. Here, on the other hand, C.A. alleged facts creating a reasonable inference that Weir and Karen conspired with state actors to cause his removal. If true, Weir and Karen are subject to Section 1983 liability.

Alternatively, Weir and Karen seek cover in the various proceedings instituted as a result of

their complaint: a formal petition for adjudication of wardship, a court hearing, investigatory conferences held by the DCFS, adjudication of wardship by the court, and a dispositional hearing by the court, seemingly arguing that because a court determined that C.A. should remain in foster care, that demonstrates that their complaints of neglect were justified. But, assuming that Weir, Karen and Deputy Sheriff James Brokaw knew the allegations of child neglect were false, then these proceedings actually weaken their case because that means they succeeded in the earlier stages of their conspiracy--they created upheaval in C.A.'s family by having him removed from his home and by subjecting his family to governmental interference. Moreover, as we have held in the criminal context, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988). Similarly, Weir and Karen cannot escape the consequences of their (alleged) actions based on the unwitting decisions of the various judges involved. See Morris v. Dearborne, 181 F.3d 657, 672-73 (5th Cir. 1999) (plaintiff stated a constitutional claim against a teacher who allegedly created false evidence of sexual abuse, notwithstanding the fact that welfare officials and state judge independently evaluated allegations of sexual abuse and ordered child removed from home)./13

Weir and Karen also seek refuge in public policy, arguing that a person who reports child abuse should not be subjected to a civil rights action for the act of reporting. We have no qualms with that proposition, but as noted above this case involves a different situation: C.A. claims that the defendants knew the allegations were false and that they conspired with a family member who was a Deputy Sheriff. In fact, it is reasonable to infer that Weir and Karen were able to pull off their plan to have C.A. removed only because they had a relative in a position of governmental authority; in any other circumstance, it seems reasonable to believe that the government would investigate the complaint before bursting into C.A.'s home and snatching him from his family. It is a rare situation indeed where family members will be conspiring with another family member who is a state actor, and thus the parade of horribles that Karen and Weir march out in the form of "public policy" will seldom, if ever, come to pass.

Before closing the Fourth Amendment discussion,

it is important to reiterate two points. First, our holding should not be read as creating a constitutional claim any time a child is removed from his home and a later investigation proves no abuse occurred. The alleged facts here go much beyond that scenario, and our holding is limited to the unique circumstances of this case. Second, it is important to remember that this case is here on 12(b)(6) dismissal. Further proceedings and discovery may well narrow this case substantially, but at this point the question is solely whether C.A. can succeed under any set of facts. Gregory v. Nunn, 895 F.2d 413, 414 (7th Cir. 1990). Because there are several factual scenarios under which C.A. could prevail, dismissal of his Fourth Amendment claim at this time would be inappropriate.

2.  Substantive Due Process--Familial Relations

In addition to suing under the Fourth Amendment, C.A. presents a substantive due process claim. To the extent that this claim is premised on his seizure from his home, however, it cannot succeed because, as the Supreme Court has recently reiterated, substantive due process should not be called upon when a specific constitutional provision protects the right allegedly infringed upon. United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). As to C.A.'s initial removal, the Fourth Amendment specifically addresses that seizure, and thus his claim should be considered under the Fourth Amendment, not under the rubric of substantive due process.

However, C.A. also asserts that his constitutional rights were violated during the entire (near) four-month period of government-forced separation from his parents. This forced separation implicates substantive due process, or more specifically C.A.'s constitutional right to familial relations./14

The Supreme Court has long recognized as a component of substantive due process the right to familial relations. See Prince v. Massachusetts, 321 U.S. 158, 166 (1944); Meyer v. Nebraska, 262 U.S. 390, 399 (1923); Santosky v. Kramer, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child."). See also, Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000) ("Parents and children have a well-

elaborated constitutional right to live together without governmental interference."); Croft v. Westmoreland County Children and Youth Services, 103 F.3d 1123, 1125 (3d Cir. 1997) ("We recognize the constitutionally protected liberty interests that parents have in the custody, care and management of their children."). See generally Troxel v. Granville, 120 S.Ct. 2054 (2000). The Due Process Clause "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." Id. at 2060. These decisions recognize that the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights--the foundation of not just this country, but of all civilization. Wisconsin v. Yoder, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children."); id., ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 503 (1977) ("[T]he institute of the family is deeply rooted in this Nation's history and tradition."). Equally fundamental is the substantive due process right of a child to be raised and nurtured by his parents. See Santosky v. Kramer, 455 U.S. 745, 760 (1982) ("[U]ntil the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of the natural relationship.") (emphasis added); J.B. v. Washington County, 127 F.3d 919, 925 (10th Cir. 1997) ("We recognize that the forced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (internal quotations omitted); Wooley v. City of Baton Rouge, 211 F.3d 913, 923 (5th Cir. 2000) ("a child's right to family integrity is concomitant to that of a parent")./15 Thus, substantive due process provides the appropriate vehicle for evaluating the constitutionality of the nearly four-month government-forced separation of C.A. from his parents. See, e.g., J.B. v. Washington County, 127 F.3d 919, 927 (10th Cir. 1997) ("[I]t is evident that there was interference with plaintiffs' rights of familial association because L.B. was physically removed from her home and from her parents for a period of almost 18 hours, which included an overnight stay in a pre-arranged shelter home."); Croft, 103 F.3d at 1125 ("The due process clause of the Fourteenth Amendment prohibits the government from interfering in the familial relationship unless the government adheres to the requirements of procedural and substantive due process.").

However, like Fourth Amendment rights, the constitutional right to familial integrity is not absolute. See Weller v. Department of Soc. Serv., 901 F.2d 387, 392 (4th Cir. 1990) ("Substantive due process does not categorically bar the government from altering parental custody rights."). "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." Croft, 103 F.3d at 1125. Thus, a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes. Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999) (the fundamental interest in the familial relationship must be balanced against the state's interest in protecting children suspected of being abused). The balance here, however, is no different than that developed in the Fourth Amendment context. Darryl H. v. Coler, 801 F.2d 893, 901 n.7 (7th Cir. 1986). See also, Wallis v. Spencer, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000) ("the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children"). In balancing these competing interests, courts have recognized that a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse. Croft, 103 F.3d at 1126. But in this case and at this stage, we lack sufficient factual details from which we can decide whether the government was justified in interfering with C.A.'s familial relations. Therefore, for the same reasons that C.A.'s Fourth Amendment claim survives, his substantive due process claim covering the approximately four-month time period during which C.A. was separated from his parents, does as well.

At this point, we again must consider which defendants are subject to suit for the alleged violation. We need not dwell on each individual defendant's involvement, however, because, as detailed above, C.A. alleged that the defendants conspired to violate his constitutional rights-- including his right to familial relations--and he presented sufficient facts to support a reasonable inference that each defendant (other than Hansen) joined the conspiracy, and thus was responsible for causing the alleged substantive due process violation. For the reasons discussed above in the context of the Fourth Amendment claim, Judge Gende is entitled to absolute immunity.

3. Procedural Due Process

C.A. also alleges a procedural due process claim, asserting that the government infringed on his liberty interest in familial relations without a pre-deprivation hearing, and that following his removal, the post-deprivation hearings lacked a semblance of due process. In contrast to substantive due process claims, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law."/16 Doe by Nelson v. Milwaukee County, 903 F.2d 499, 502 (7th Cir. 1990). Thus, a procedural due process claim involves a two-part analysis: First, we determine whether the defendants deprived the plaintiff of a protected liberty or property interest, and if so, then we assess what process was due. Hamlin v. Vaudenberg, 95 F.3d 580, 584 (7th Cir. 1996).

In this case, C.A. alleged a liberty interest in his familial relations. This is a protected liberty interest. Santosky, 455 U.S. at 753; Stanley v. Illinois, 405 U.S. 645, 651-52 (1972). See also, Doe, 903 F.2d at 504 n.9. Thus, we must consider what process was due. Hamlin, 95 F.3d at 583. The Supreme Court has said that parental rights cannot be denied without an "opportunity for them to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotations omitted). Similarly, a child's right to be nurtured by his parents cannot be denied without an opportunity to be heard in a meaningful way. What exactly this means is less clear, as the amount of process due varies with the particular situation--it is a "flexible" concept. Id. at 334.

However, no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents. Malik v. Arapahoe County Dept. of Social Serv., 191 F.3d 1306, 1315 (10th Cir. 1999) ("An ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard."). Minimally, it also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances. Hollingsworth v. Hill, 110 F.3d 733, 739 (10th Cir. 1997) ("Removal of children from the custody of their parents requires predeprivation notice

and a hearing except for extraordinary situations where some valid governmental interest is at stake that justified postponing the hearing until after the event."); Malik, 191 F.3d at 1315 (a parent has a liberty interest in familial association and privacy that--absent extraordinary circumstances--cannot be violated without adequate pre-deprivation procedures). Cf. Lossman v. Pekarske, 707 F.2d 288, 291 (7th Cir. 1983) ("When a child's safety is threatened, that is justification enough for action first and hearing afterward."); Jordan by Jordan v. Jackson, 15 F.3d 333, 346 (4th Cir. 1994) ("[O]nly where a child's life is in imminent danger or where there is immediate danger of severe or irreparable injury to the child's health (and prior judicial authorization is not immediately obtainable) may an official summarily assume custody of a child from his parents.").

Because C.A. claims that he was removed based on knowingly false statements of child neglect, and that the defendants removed him from his home without an investigation, a pre-deprivation hearing, or exigent circumstances, he has stated a procedural due process claim as well.

Perhaps the facts as developed on remand will demonstrate that a pre-deprivation hearing was not constitutionally required because emergency action was required to avert imminent harm to C.A. Donald v. Polk County, 836 F.2d 376, 380 (7th Cir. 1988) ("In an emergency situation the government may take away liberty with post-deprivation hearing."). Nevertheless, "the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed." Weller, 901 F.2d at 393 (internal quotations omitted). Thus, due process guarantees that the post-deprivation judicial review of a child's removal be prompt and fair. See, e.g., Campbell v. Burt, 141 F.3d 927, 929 (9th Cir. 1998) (procedural due process guarantees prompt and adequate post-deprivation judicial review in child custody case); Jordan by Jordan, 15 F.3d at 343 ("[I]t is well-settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child provided that adequate post-deprivation process to ratify the emergency action is promptly accorded.").

In this case, C.A. presents several facts calling into question the constitutional adequacy of the post-deprivation hearing: He contends that the defendants filed or conspired to file false statements with the court. He also contends that the social study prepared concerning C.A. and his sister was not provided to his parents prior to the custody hearing, and that the court relied in

part on this study to order him a ward of the state; he asserts that the study included false information. Together, these allegations are sufficient to state a procedural due process claim based on the post-deprivation process afforded C.A. See, e.g., Morrison v. Jones, 607 F.2d 1269, 1276 (9th Cir. 1979) (dismissal of procedural due process claim improper where mother alleged child was removed without adequate post-deprivation hearing)./17 Cf., Schacht v. Wisconsin Dept. of Corrections, 175 F.3d 497, 503 (7th Cir. 1999) ("We agree that sham procedures do not satisfy due process and that, for purposes of something like Rule 12(b)(6), [plaintiff] stated a claim."). Moreover, because of the alleged constitutional defects of the post-deprivation hearing, at this stage we cannot conclude that the post-deprivation hearings eliminated any procedural due process claim based on C.A.'s pre-deprivation removal. Compare with Lossman v. Pekarske, 707 F.2d 288 (7th Cir. 1983), and Donald v. Polk County, 836 F.2d 376, 380 (7th Cir. 1988) (holding that post-deprivation hearing establishing probable cause of abuse prevented due process claim for lack of pre-deprivation hearing).

Again the question remains as to which defendants are liable for any procedural due process violation. The defendants who allegedly made the false statements, Deputy Sheriff James Brokaw, Weir Brokaw and Karen Weaver, are appropriate defendants. C.A. alleged that the other defendants conspired with those state actors (and except as to Probation Officer Hansen, gave sufficient details of their role in the conspiracy to create liability), and thus, the remaining defendants (other than Probation Officer Hansen, and Judge Gende--who is entitled to absolute judicial immunity) are likewise appropriate defendants for this claim as well.

B.  Qualified Immunity

Next we consider whether the individual defendants are entitled to qualified immunity./18 Qualified immunity protects government officials from individual liability under Section 1983 for actions taken while performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, before liability will attach, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The defendants argue that it was not clearly established in June 1983 that their actions violated C.A.'s constitutional rights, noting that C.A. failed to cite to closely analogous cases clearly establishing his constitutional rights. However, a plaintiff need not always identify a closely analogous case; rather, he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue. Thus, binding precedent is not necessary to clearly establish a right. Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988). In fact, in the most extreme cases, an analogous case might never arise because "the existence of the right was so clear, as a matter of the wording of a constitutional or statutory provision or decisions in other circuits or in the state courts, that no one thought it worthwhile to litigate the issue." Burgess v. Lowery, 201 F.3d 942, 945 (7th Cir. 2000). See, e.g., K.H. Through Murphy v. Morgan, 914 F.2d 846, 851 (7th Cir. 1990) (An easy or obvious case of deprivation that has no precedent does not mean that "officials would be immune from damages liability because no previous case had found liability in those circumstances.").

As alleged, this case fits that principle to a T. The defendants' alleged conduct in this case is so severe that a reasonable person would have understood that he was violating C.A.'s constitutional rights. Specifically, a reasonable person would have known that it was unconstitutional to use the government's power to cause, or conspire to cause, the unjustified removal of a six-year-old child from his parents in order to destroy the family, based simply on the family's religious beliefs. Cf. Morris v. Dearborne, 181 F.3d 657, 668 (5th Cir. 1999) ("It is beyond purview that any rational teacher could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed."); id. at 672 (making knowingly false statements of child neglect violates clearly established constitutional right to familial relations); Malik, 191 F.3d at 1316 ("[I]t is clearly established law that government official's procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment.") (internal quotation omitted). Moreover, even if the individual defendants did not know the allegations of neglect were false, qualified immunity may still not protect them because, depending on the nature of the claims of neglect, it may well be that a reasonable law enforcement official would recognize that C.A.'s pre-hearing, pre-investigation seizure violated

the Fourth Amendment. See, e.g., Good, 891 F.2d at 1094-95 (denying defendants' claim of qualified immunity because a reasonable person should have known that warrantless search was unconstitutional given that allegations of neglect would not cause a reasonable person to believe the child was in imminent danger of serious bodily injury); Franz v. Lytle, 997 F.2d 784, 791-92 (10th Cir. 1993) (no reasonable officer would believe that he could visually and physically inspect two-year old child's vagina based on one complaint that the child had a severe diaper rash). Therefore, while the facts ultimately may not support these claims, at this stage we must reject the defendants' qualified immunity defense.

In closing our discussion of qualified immunity, we note that several circuit courts have concluded that because the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely--if ever--be clearly established. See, e.g., Kiser v. Garrett, 67 F.3d 1166, 1169-74 (5th Cir. 1995); Hodorowski v. Ray, 844 F.2d 1210, 1216-17 (5th Cir. 1988); Tenenbaum v. Williams, 193 F.3d 581, 595-96 (2d Cir. 1999); Doe v. State of Louisiana, 2 F.3d 1412, 1416-21 (5th Cir. 1993); Frazier v. Bailey, 957 F.2d 920, 929-31 (1st Cir. 1992). While we agree that that is generally the case, see e.g., Landstrom v. Illinois Dept. of Children and Family Serv., 892 F.2d 670, 674-78 (7th Cir. 1990); Darryl H. v. Coler, 801 F.2d 893, 907-08 (7th Cir. 1986), as noted above, some governmental actions are so clearly beyond the pale that a reasonable person should have known of their unconstitutionality even without a closely analogous case. Thus,
[c]ases claiming governmental interference with the right of family integrity are properly analyzed by placing them, on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy. When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity. However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the

right to family integrity was not clearly established, will fail.
Morris, 181 F.3d at 671.

Here we do not know enough facts to determine where along the continuum this case falls. And given the role of specific facts, "[i]t is impossible to know which clearly established rules of law to consult unless you know what is going on." Elliott v. Thomas, 937 F.2d 338, 342 (7th Cir. 1991). Accordingly, at this time, we cannot conclude that the individual defendants are entitled to qualified immunity because the facts once uncovered may turn out to be so severe and obviously wrong that the defendants should have known they were violating C.A.'s constitutional rights. See, e.g., Good, 891 F.2d 1087.

C.  Section 1985(3)

C.A. also seeks recovery under Section 1985(3)./19 Section 1985(3) provides in relevant part: "If two or more persons in any state or Territory conspire . . . for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. sec. 1985(3). "A plaintiff raising a claim under sec. 1985(3) must allege (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." Majeske v. Fraternal Order of Police, Local Lodge No. 7, 94 F.3d 307, 311 (7th Cir. 1996).

To establish that the purpose of the conspiracy is to "deprive a person or class of persons of equal protection of the laws," the plaintiff must allege "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). This court has clarified that otherwise "class-based invidiously discriminatory animus" includes "conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty." Volk v. Coler, 845 F.2d 1422, 1434 (7th Cir. 1988).

C.A. alleged sufficient facts to support a claim under Section 1985(3): He alleged a conspiracy (and as discussed in the context of Section 1983, he did so with sufficient factual detail), and

several acts in furtherance of the alleged conspiracy. He also alleged that the conspirators had an invidious animus--religion. As a result of this conspiracy, C.A. alleged that he was injured in that his Fourth Amendment and Due Process rights were violated. While Due Process rights and Fourth Amendment rights are not protected against private conspiracies under Section 1985(3),/20 in this case C.A. alleged that the conspiracy included state actors and that the alleged conspiracy was aimed at influencing state activity--the court proceeding in his custody case. Therefore, C.A. has sufficiently alleged "a deprivation of a right or privilege granted to U.S. citizens." See, e.g., United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 830 (1983). Accordingly, C.A.'s allegations are sufficient to state a claim under Section 1985(3) as well.

D.  Disqualification

One issue remains. Before the district court, C.A. moved to disqualify Judge McDade arguing that he has demonstrated bias and created an appearance of partiality through his handling of C.A.'s complaint. Specifically, C.A. complains that Judge McDade demonstrated an alliance with the defendants by issuing a Rule to Show Cause as to why C.A.'s complaint was not barred by the statute of limitations. C.A. asserts that because the statute of limitations is a waivable affirmative defense, the district court could not raise it sua sponte. C.A. also contends that the district court demonstrated partiality by sua sponte waiving the local rule requiring the defendants to file a memorandum of law in response to the motion to dismiss; by failing to give him the benefit of Rule 6(e) which allowed him three additional days to respond to the defendants' motion to dismiss because it was served by mail; by sua sponte dismissing the complaint against Sheriff Thirtyacre; and by refusing to accept as true his allegations that Judge Susan Gende acted in a dual role of investigator and judge. C.A. argues that cumulatively these rulings indicate that Judge McDade assumed an advocacy role on behalf of the defendants requiring his disqualification under 28 U.S.C. sec. 455(a) and (b)(1), and 28 U.S.C. sec. 144.

Section 455(a) requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," and section 455(b)(1) provides that a judge shall disqualify himself if he "has a personal bias or prejudice concerning a party." C.A. seeks Judge McDade's recusal under both sections. However, we have held that "the denial of a request that the

judge recuse himself under section 455(a) must be appealed immediately by application for writ of mandamus, or it is waived." United States v. Horton, 98 F.3d 313, 316 (7th Cir. 1996). Because C.A. did not petition for mandamus, "this Court cannot review [the district court's] disposition of the Section 455(a) motion." Durhan v. Neopolitan, 875 F.2d 91, 96-97 (7th Cir. 1989).

"It is less clear under our case law whether we may review a refusal to recuse under section 455(b) when the argument is raised for the first time on appeal." United States v. Smith, 210 F.3d 760, 764 (7th Cir. 2000).We need not decide whether a claim for recusal under Section 455(b) can be raised on direct appeal rather than mandamus, however, because we conclude that under Section 455(b), Judge McDade was not required to recuse.

"In determining whether a judge must disqualify himself under 28 U.S.C. sec. 455(b)(1), the question is whether a reasonable person would be convinced the judge was biased." Hook v. McDade, 89 F.3d 350, 355 (7th Cir. 1996) (internal quotation omitted). Recusal under Section 455 (b)(1) "is required only if actual bias or prejudice is proved by compelling evidence." Id. Moreover, as the Supreme Court has made clear, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). Against this backdrop, we must conclude that a reasonable person would not reasonably believe that the district court was biased or prejudiced against C.A. because the only evidence of bias C.A. presents consists of judicial rulings. Moreover, those rulings do not demonstrate evidence of personal animosity or malice, which is necessary to succeed on a Section 455(b)(1) motion. Hook, 89 F.3d at 355 ("bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, . . ."). Therefore, the district court did not err in refusing to recuse under Section 455(b)(1).

C.A. also asserts that the district court was required to recuse under 28 U.S.C. sec. 144 which provides in pertinent part:
Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
28 U.S.C. sec. 144.

Because the phrase "personal bias or prejudice" found in Section 144 mirrors the language of Section 455(b), our analysis under Section 144 is identical. United States v. Balistrieri, 779 F.2d 1191, 1202 (7th Cir. 1985) ("[W]e shall view judicial interpretations of 'personal bias or prejudice' under sec. 144 as equally applicable to sec. 455(b)(1)."). Therefore, for the same reasons that recusal was not required under Section 455(a), it was not required under Section 144./21

III.  Conclusion

Dismissal pursuant to 12(b)(6) is appropriate only if the plaintiff could not possibly succeed under any set of facts. Reading the facts in the light most favorable to C.A., he may be able to succeed on his Fourth Amendment and Due Process claims under both Sections 1983 and 1985 against all of the defendants except Probation Officer Hansen and Judge Gende. Therefore, we reverse the district court, except as to these defendants. Having dismissed the federal claims, the district court also dismissed C.A.'s supplemental state law claims of intentional infliction of emotional distress and false imprisonment. Because the federal claims were improperly dismissed, we also reverse the dismissal of the supplemental claims. This case is REMANDED for further consideration consistent with this opinion.

/1 While the complaint does not explicitly state that these defendants knew the allegations of child neglect were false, that is the reasonable implication of "baseless," and the parties on appeal seem to assume that is what C.A. meant when he alleged in his pro se complaint "baseless." Therefore, for purposes of 12(b)(6), we will analyze the constitutional claims assuming that Weir, James and Karen knew the allegations of child neglect were false.

/2 C.A. does not appeal the dismissal of his claims against the State of Illinois or defendant Steve Dickens.

/3 The Attorney General maintains that probation officers are entitled to Eleventh Amendment immunity because they are state officers, as demonstrated by the fact that they serve in the state court system and are considered judicial employees in Illinois. 730 ILCS 110/9b(3) (1996). Of course, the question is whether, in this case, the probation officers were acting on behalf of the state or a local subdivision of the state. See, e.g., McMillian v. Monroe County, Ala., 520 U.S. 781 (1997) (establishing an analytical

framework for determining whether a state actor is acting on behalf of the state, and thus entitled to Eleventh Amendment immunity, or a county or local municipality, and thus not so entitled). But we need not decide that issue because, as noted above, C.A. asserts that he is suing those defendants in their individual capacities, and thus the Eleventh Amendment is not implicated.

/4 In denying C.A.'s motion to amend his complaint, the district court stated that it is not "fair to characterize the plaintiff's removal from his family home as an 'arrest.'" However, the Fourth Amendment extends beyond criminal "arrests" to civil "seizures," Wooley v. City of Baton Rouge, 211 F.3d 913, 925 (5th Cir. 2000), including a child's removal by social workers. Id. See also, Tenenbaum v. Williams, 193 F.3d 581, 601-06 (2d Cir. 1999) (analyzing seizure of a child by the State during an abuse investigation under the Fourth Amendment); J.B. v. Washington County, 127 F.3d 919, 928-31 (10th Cir. 1997) (county officials' temporary removal of child is a seizure implicating the Fourth Amendment); Wallis v. Spencer, 202 F.3d 1126, 1137 n. 8 (9th Cir. 2000) (removal of children should be assessed under the Fourth Amendment). Cf. Darryl H. v. Coler, 801 F.2d 893, 900 (7th Cir. 1986) (analyzing visual inspection of child in neglect investigation under reasonableness standard of the Fourth Amendment).

/5 In his brief on appeal, C.A. also argues that because the standards for seizing a child under the Fourth Amendment differ from those applicable to an arrest of an adult, his seizure violates the Equal Protection Clause of the Constitution. The Fourth Amendment, however, requires a seizure to be "reasonable" and "reasonableness" depends upon the surrounding circumstances, including whether the seizure is of a child for protective purposes. The fact that the standard may differ does not implicate the Equal Protection Clause.

/6 C.A. did not allege in his pro se amended complaint that Weakley removed him from his home, but he presents this additional fact in his brief on appeal. He also sought leave to amend his complaint against Weakley to correct this oversight, but the district court denied his motion. Because this fact is consistent with the other allegations against Weakley, and for the sake of judicial economy, we will consider it on appeal, rather than reversing the district court's decision denying C.A. leave to amend his complaint--a decision premised on the district court's incorrect belief that the Fourth Amendment did not apply to C.A.'s seizure.

/7 It is unclear whether C.A. intended to sue Weakley and Brokaw in their individual or official capacities. However, in their motions to dismiss, Weakley and Brokaw both seem to have treated C.A.'s pro se complaint as alleging individual capacity claims. Additionally, C.A.'s pro se complaint indicates that he intended to sue Weakley and Brokaw in their individual capacities because the complaint does not allege they were acting in their "official capacity," as it does in the count against Sheriff Thirtyacre. Therefore, for purposes of appeal, we will consider C.A.'s claims against Weakley and Brokaw as individual capacity claims. See, e.g., Stevens v. Umsted, 131 F.3d 697, 707 (7th Cir. 1997) (while a suit against a government official will be assumed an official capacity suit, that assumption may be overcome if the parties treat it as an individual capacity suit).

/8 While Sheriff Thirtyacre was served, he did not respond to the lawsuit. It is unclear from the record whether Thirtyacre is still the Sheriff of Mercer County, and whether or not service of Thirtyacre sufficed for purposes of the Mercer County Sheriff's Office. We leave this issue for remand.

/9 The Mercer County Sheriff's Department never responded to C.A.'s complaint, see supra at 14-15 n.7, and while Mercer County originally filed a brief on appeal, it was stricken following our appointment of counsel to represent C.A. and the filing of a new brief on C.A.'s behalf, and Mercer County never filed an amended brief. Therefore, we lack the benefit of its input.

/10  On appeal, Ingersoll does not argue that she is entitled to absolute immunity. Nor would absolute immunity protect Ingersoll for her role in initiating C.A.'s removal, or in gathering evidence. See Millspaugh v. County Dept. of Pub. Welfare of Wabash County, 937 F.2d 1172, 1175 (7th Cir. 1991) (social worker is not entitled to absolute immunity for actions taken in applying for a court order to remove children or for steps taken to gather evidence). However, absolute immunity would protect Ingersoll for her involvement in the judicial process. Id. See also, K.H. through Murphy v. Morgan, 914 F.2d 846, 853 (7th Cir. 1990).

/11 In his complaint, C.A. alleged that Ingersoll, Bartelt, Thirtyacre, and Gende attended the investigatory conference. In his brief on appeal, C.A. states that Hansen was also present.

/12 In his complaint, C.A. asserted that the defendants violated his First Amendment rights,

probably because of the defendants' alleged anti-religious motivation for seeking his removal. However, on appeal, C.A. does not argues this theory, so we need not consider whether defendants' alleged motive creates a First Amendment claim as well.

/13 While we have held that a post-deprivation hearing which results in a judicial determination that a child's removal is justified would prevent a due process claim based on the lack of a pre-deprivation hearing, see, e.g., Lossman v. Pekarske, 707 F.2d 288 (7th Cir. 1983); Donald v. Polk County, 836 F.2d 376, 380 (7th Cir. 1988), those cases are distinguishable because they did not involve allegations that the defendants intentionally presented the court with false claims of neglect. Compare with, Morris v. Dearborne, 181 F.3d 657, 673 (5th Cir. 1999).

/14 This assumes of course that C.A.'s four-month "separation period" is not a "seizure" within the meaning of the Fourth Amendment. In the criminal context, this court has rejected the concept of a "continuing seizure," holding instead that following a Gerstein probable cause hearing, the Fourth Amendment no longer applies, but that substantive due process addresses the post-probable cause detention. Wilkins v. May, 872 F.2d 190, 194 (7th Cir. 1989). See, e.g., Reed v. City of Chicago, 77 F.3d 1049, 1051-52 (7th Cir. 1996) (summarizing the constitutional approach applied in the sequence from arrest to post-conviction confinement). But in Albright v. Oliver, 510 U.S. 266 (1994), the Supreme Court held that an action for malicious prosecution cannot be based on substantive due process. This has led us to question the continued validity of Wilkins. Reed, 77 F.3d 1052 (noting that the analysis enunciated in Wilkins may not have survived Albright). However, we need not revisit Wilkins today because C.A. has a substantive due process right beyond that rejected in Albright--namely the right to familial relations--and whether we analyze C.A.'s claim under the Fourth Amendment or substantive due process, the result is the same. See infra at 27-28.

/15 But see Lossman v. Pekarske, 707 F.2d 288, 290 (7th Cir. 1983) (questioning whether a child has a liberty interest given that a child is always subject to someone's custody).

/16 It is possible to state both a procedural and substantive due process claim. Cf. Owen v. Lash, 682 F.2d 648, 652 n.4 (7th Cir. 1982) (holding that "[a] single act of depriving a citizen of his right to correspond may simultaneously constitute a violation of substantive

constitutional right and of the right to procedural due process"). Therefore, the defendants' actions toward C.A. may simultaneously constitute a violation of his substantive due process rights (if his removal was not justified by a sufficiently compelling governmental interest) and his right to procedural due process (if the manner in which the deprivation occurred violates procedural norms). See, e.g., Croft, 103 F.3d at 1125 ("The Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requisites of procedural and substantive due process.").

/17 C.A. also contends that his procedural due process rights were violated because he was questioned without the benefit of a guardian ad litem or an attorney. At this stage, and based on the sparse factual allegations, we cannot evaluate the constitutional impact of any questioning done outside the presence of his parents and without the benefit of someone representing C.A.'s interests. This issue should be considered on remand following further development of the factual record.

/18 Qualified immunity is a defense available only to individual defendants; it does not apply to the Mercer County Sheriff's Department or Mercer County. See, e.g., Tenenbaum, 193 F.3d at 597 ("While the individual defendants are entitled to qualified immunity, the City is not.") (citing Owen v. City of Independence, Mo., 445 U.S. 622, 657 (1980)).
/19 In his pro se complaint, C.A. cited only to Section 1983, but the district court considered his complaint under Sections 1983 and 1985(3), and on appeal C.A. contends that his suit is brought under both sections. As we have explained before, notice pleading requires the plaintiff to allege just enough to put the defendant on notice of facts providing a right to recovery and not to cite to the appropriate statute creating that right. Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992) ("Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations."). Therefore, even though C.A. did not cite Section 1985(3), we must nonetheless consider whether C.A. alleged facts sufficient to sustain a claim under Section 1985(3).

/20 While Section 1985(3) extends to private conspiracies, for a private conspiracy to be actionable it must affect the "Thirteenth Amendment right to be free from involuntary

servitude, and, in the same Thirteenth Amendment context, the right of interstate travel." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278 (1993).

/21 C.A. requests that this case be reassigned on remand. We see no reason to do so.