In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1300

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN A. LEE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:18-cr-30011 — **Sue E. Myerscough**, *Judge.*

ARGUED SEPTEMBER 26, 2019 — DECIDED FEBRUARY 18, 2020

Before BAUER, MANION, and ST. EVE, *Circuit Judges.*

MANION, *Circuit Judge*. Shawn Lee sold a staggering amount of ice methamphetamine in Central Illinois from early 2015 until his arrest in January 2018. He now appeals his sentence after pleading guilty to one count of possessing 50 grams or more of methamphetamine with intent to distribute and one count of possessing firearms in furtherance of a drug-trafficking crime. Lee contends he should not have received two extra criminal history points under U.S.S.G. § 4A1.1(d)

for dealing methamphetamine while on supervision for a drunk driving offense. He also challenges the district judge's imposition of a fine and a term of supervised release that will prohibit him from interacting with known felons unless he receives the probation officer's permission. Because this supervision term violates the rule against delegating Article III power, we vacate the condition and remand for reassessment. We affirm on all other grounds.

## I. Background

In late 2017 and early 2018, DEA agents and Illinois State Police learned through multiple independent informants that Shawn Lee had been distributing large quantities of ice methamphetamine near Carlinville, Illinois. DEA agents confirmed those reports by arranging a controlled buy between a confidential source and Lee on January 16, 2018, during which the source purchased over 83 grams of ice methamphetamine for $1,500. On January 23, 2018, state troopers conducted a planned traffic stop on a vehicle driven by Lee. Lee consented to a K-9 walkaround of the vehicle and the dog alerted to the presence of drugs. Troopers searched the car and found over seven pounds of ice methamphetamine and $19,170 in cash, including $900 of marked money used in the January 16 controlled buy.

Agents arrested and interviewed Lee. He told them he had been dealing ice methamphetamine in the Carlinville area for the last three years—since around January 2015—and admitted he intended to ship the seized currency to his supplier in partial satisfaction of a drug debt. Lee started out transacting in eight-ounce quantities of methamphetamine but graduated to dealing *pounds* of drugs from about June 2017 until his arrest. During that seven-month period alone, Lee distributed

approximately 100 pounds (45.36 kilograms) of methamphet-amine. He purchased the drugs for $7,000 per pound (totaling $700,000 worth of methamphetamine) and resold them at $11,200 per pound ($1.12 million in sales). Investigators lacked enough information to determine the amount of drugs Lee dealt from the start of his illegal conduct until June 2017. Lee informed agents he turned to selling methamphetamine after losing his job because of his own drug use.

Based on additional details gained during the investigation, agents obtained and executed a search warrant at Lee's residence. Inside, agents discovered ice methamphetamine and various other suspected narcotics hidden throughout the house. Agents also discovered twelve firearms[1] in close proximity to the drugs, along with scales, drug paraphernalia, and assorted ammunition and magazines. The government charged Lee with one count of distributing 50 grams or more of methamphetamine for the January 16 controlled buy (Count 1), two counts of possessing 50 grams or more of meth-amphetamine with intent to distribute (Counts 2 and 3), and one count of possessing firearms in furtherance of a drug-traf-ficking crime (Count 4).

Lee entered a blind guilty plea on Counts 2 and 4. As set forth in the presentence report ("PSR"), the massive amount of drugs prompted a base offense level of 38 for Count 2. The base level was then reduced for acceptance of responsibility, resulting in a total offense level of 35. Lee's record earned him three criminal history points: one point for a 2015 drunk

---

[1] Agents discovered a thirteenth gun—an antique that did not meet the technical "firearm" definition. The government did not charge Lee's possession of that gun.

driving conviction and two points for committing the instant crimes while on supervision for the drunk driving offense. The three total points placed Lee in criminal history category II, which, combined with the total offense level of 35, resulted in a sentencing range of 188 to 235 months' imprisonment on Count 2. The Guidelines range for Count 4 equaled the statutory minimum: 60 months' imprisonment.

The PSR also included information about Lee's finances, including a list of assets (totaling nearly $190,000) and a net worth greater than $102,000.[2] Despite this information, the probation officer opined, "it appears [Lee] does not have the ability to pay a fine or community restitution." (PSR ¶ 96.) The Guidelines called for a fine range of $40,000 to $10,000,000.

At sentencing, the district judge adopted the PSR's factual findings as her own. She calculated the same Guidelines ranges as set forth in the PSR: 188 to 235 months' imprisonment on Count 2 and 60 months' imprisonment on Count 4. Neither party objected.

The district judge sentenced Lee to 210 months' imprisonment, consisting of 150 months on Count 2—a below-Guidelines sentence—and 60 months on Count 4, to be served consecutively. The judge further imposed a $20,000 fine—a below-Guidelines amount—after weighing the huge amount of ice methamphetamine Lee sold, the dangerousness of that drug, and the need to deprive offenders of ill-gotten gains against Lee's available assets. Upon release, the judge ordered Lee to a term of five years' supervision. Among the several

---

[2] We note Lee's primary asset, his home, is in foreclosure, meaning his total assets and net worth will be substantially less upon his release from prison.

terms Lee must comply with during that period is Condition No. 7, which limits his ability to interact with known felons unless granted permission by the probation officer. Two of Lee's sons are convicted felons.

## II. Discussion

Lee challenges his criminal history score, the $20,000 fine, and supervisory Condition No. 7. We affirm his sentence with one narrow exception. First, the district judge calculated Lee's criminal history score correctly when she assessed two extra points under U.S.S.G. § 4A1.1(d). Second, the judge provided adequate consideration of the necessary factors to support the fine. And finally, Condition No. 7 implicates Lee's familial association interests on a prospective level only, so, at this point, we need not wade into that argument's merits. The same term of supervision, however, improperly delegates Article III power to the probation officer, requiring reassessment.

A. <u>Lee's Criminal History</u>

Lee maintains his criminal history score should not have been enhanced by U.S.S.G. § 4A1.1(d), which adds two points "if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." This challenge lacks merit because Lee engaged in conduct related to his offense while on supervision for his state drunk driving conviction.[3]

The commentary to § 4A1.1(d) instructs courts to add two points if the defendant committed the instant offense,

---

[3] The parties debate whether Lee waived this challenge, but we do not address waiver here.

including any relevant conduct, while on supervision. U.S.S.G. § 4A1.1(d), Application Note 4. When investigators interviewed Lee in January 2018, he admitted to dealing methamphetamine in the region for the previous three years. This course of dealing constitutes relevant conduct. *See, e.g.*, *United States v. Stephenson*, 557 F.3d 449, 456–57 (7th Cir. 2009) (holding defendant's continuous dealing of the same drug in the same locale using the same few distributors during the common eight-year time frame qualified as conduct related to the charged transaction). His July 2015 drunk driving conviction and resulting year of supervision fall squarely within this time period. The district judge therefore awarded two extra criminal history points correctly under § 4A1.1(d).

Lee's only response to the relevant conduct hurdle is that his statements to investigators cannot be used to enhance his sentence (by way of his criminal history calculation). This argument misses the mark. Lee invokes language extracted from the safety-valve provision at 18 U.S.C. § 3553(f): "Information disclosed by a defendant under this subsection may not be used to enhance the sentence of the defendant unless the information relates to a violent offense." That provision does not apply here. The district court made no finding regarding the safety valve (the record does not indicate the safety valve ever came up at all), and in any event, Lee would not be eligible to receive its benefits because he fails the following criteria: the defendant must not have "possess[ed] a firearm or other dangerous weapon … in connection with the offense." § 3553(f)(2); *United States v. Collins*, 924 F.3d 436, 440–41 (7th Cir. 2019). He possessed twelve firearms too many in connection with his drug business.

B.  Lee's $20,000 Fine

Lee claims the district judge failed to justify his below-Guidelines fine, which the judge imposed over the probation officer's recommendation that Lee did not appear able to pay one. "When a district court determines that a fine is in order, we will only reverse its factual finding if it is clearly erroneous." *United States v. Artley*, 489 F.3d 813, 826 (7th Cir. 2007). In other words, the record must clearly indicate whether the district judge "properly has considered the relevant factors" set forth below. *United States v. Bauer*, 129 F.3d 962, 968 (7th Cir. 1997).

Section 5E1.2 of the Guidelines mandates the imposition of a fine unless "the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "This language is to be taken seriously: the judge *must* impose a fine, unless the defendant demonstrates that he cannot pay *anything*, either at sentencing or in the foreseeable future." *United States v. Gomez*, 24 F.3d 924, 926–27 (7th Cir. 1994). The defendant's burden here is a heavy one "because almost everyone has or will acquire some assets." *Id.* at 927. The Guidelines state the district judge "shall consider" eight factors before imposing a fine:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
>
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to

pay over a period of time) in light of his earning capacity and financial resources;

(3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) any restitution or reparation that the defendant has made or is obligated to make;

(5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6) whether the defendant previously has been fined for a similar offense;

(7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). Similar "factors to be considered" can be found at 18 U.S.C. § 3572(a).[4]

When imposing a fine, a district judge need not make express or specific findings regarding each of the relevant factors, *Bauer*, 129 F.3d at 966, although an express finding may nonetheless be made by adopting the PSR's facts, *id.* (citing *United States v. Monem*, 104 F.3d 905, 912 (7th Cir. 1997)). This approach keeps the focus on the need for the judge to weigh the necessary factors without requiring her to give an "often unnecessary" articulation of her findings. *Id.* at 967–68; *see also*

---

[4] In addition to its own factors, § 3572(a) requires consideration of those listed under 18 U.S.C. § 3553(a).

*United States v. Petty*, 132 F.3d 373, 382 (7th Cir. 1997) (reciting *Bauer*'s standard and explaining, "We desired to relieve the district courts, when possible, from the substantial burden of making express findings when simply adopting the PSR will do as well.").

The record reveals the district judge considered the relevant factors sufficiently. Before imposing Lee's fine, the judge emphasized the seriousness of Lee's offense, which created "a significant danger to the community": Lee distributed a "massive amount" of ice methamphetamine—a "very dangerous" drug—and possessed a dozen firearms in connection with that offense. (Lee's Br. App. at 66.) *See* U.S.S.G. § 5E1.2(d)(1), *and* 18 U.S.C. § 3553(a)(1–2) (the sentencing court shall consider the nature, circumstances, and seriousness of the offense). She also underscored the need to deprive Lee of his ill-gotten gains and to deter others from attempting to profit through similar illicit enterprises, *see* 18 U.S.C. §§ 3572(a)(5), 3553(a)(2)(B), by rejecting his sentencing argument that he used drug proceeds to help others. As the district judge stated, "So did El Chapo. He helped out his community as well with the ill-gotten gains that he received from illegal drugs." (Lee's Br. App. at 67.) Put differently, good deeds do not excuse the illegal acts that make them possible, nor do they outweigh the danger and harm Lee's drug trade posed to the public.

The PSR also contained information about other relevant factors, such as Lee's financial resources and the lack of dependents, pecuniary loss, and restitution. *See* U.S.S.G. § 5E1.2(d)(2–4); 18 U.S.C. § 3572(a)(1–3); *see also United States v. Patterson*, 698 F. App'x 840, 841 (7th Cir. 2017) (affirming the district judge's justification for the imposed fine where he

adopted the PSR's factual findings regarding these same items). Notably, the PSR detailed several assets with a combined value exceeding the ultimate fine amount, including Lee's two automobiles and two all-terrain vehicles ($7,300 total), his work tools ($15,000), and $14,200[5] in savings bonds. (PSR ¶ 94.) By adopting the PSR's contents, the district judge made express findings for each of these factors, further supporting the imposed fine. *Bauer*, 129 F.3d at 966 (citing *Monem*, 104 F.3d at 912).

Because the district judge accepted the PSR's factual findings yet departed from the probation officer's estimate regarding Lee's ability to pay a fine, Lee insists the fine be vacated under *Bauer*. In that case, we held the underpinnings of a fine may be lacking when, for example, "the district court adopts the factual findings contained in the presentence report but deviates from the fine recommendation, if any, made by the United States Probation Office, or alternatively, if the district court declines to adopt the findings in the presentence report and makes no findings of its own." 129 F.3d at 968.

But *Bauer*'s language describes situations in which the district court either imposes a fine inconsistent with its stated

---

[5] The PSR listed the savings bonds' value erroneously as $20,000. Lee filed a post-sentencing motion under Fed. R. Crim. P. 35(a) seeking a reduced fine equal to the bonds' actual worth ($14,200). The district judge denied Lee's request and reiterated the bases for the fine in a written order. (Doc. 39.) Both the Rule 35(a) motion and the resulting order were entered *after* Lee filed his notice of appeal, however, so the parties debate whether we have jurisdiction to consider the order's contents when addressing Lee's fine challenge. We need not consider the order; it cites only Lee's assets and the nature, circumstances, and severity of his crimes. The record already reflects a consideration of these factors.

intentions or fails to make any findings of fact at all. *Id.* at 967. We pointed to *Monem* as illustrative of the former, where the probation officer recommended a *below*-Guidelines fine because of the defendant's financial status. *Bauer*, 129 F.3d at 967 (discussing *Monem*, 104 F.3d at 911–12). But at Monem's sentencing, the judge stated: "The Court will accept the recommendation of the presentence report and impose a fine of $15,000, which is the *minimum* fine." *Monem*, 104 F.3d at 912 (emphasis added). So, the judge imposed a fine higher than the PSR's recommendation while purporting to accept it. We therefore could not "accept the district court's blanket statement that it accepted the recommendation of the PSR when an unexplained contradiction [was] evident from the record." *Id.*

The same ambiguity does not exist here. True, the district judge adopted the factual findings of the PSR as her own near the start of Lee's sentencing. But the record does not end on that rote announcement. Rather, the judge entertained argument from the parties regarding Lee's financial status, *rejected* the probation officer's recommendation of no fine, and in doing so reached her own conclusion that Lee could pay a $20,000 fine. And by adopting the PSR's findings regarding Lee's total assets worth well in excess of that amount, the judge supported this conclusion sufficiently. Lee's fine did not result from any error, clear or otherwise.

### C. Supervised Release Condition No. 7

The district judge also sentenced Lee to five years' supervised release on each count of conviction, to be served concurrently. Among the various terms of supervision, the judge ordered Lee not to:

> knowingly meet, communicate, or otherwise in-
> teract with any person whom he knows to be a
> convicted felon or to be engaged in, or planning
> to engage in, criminal activity, unless granted
> permission to do so by the probation officer.

(Lee's Br. App. at 78.) Lee's challenge to this condition is two-fold: first, Lee maintains the condition, as written, commits an improper delegation of Article III power to the probation officer; and second, because two of his sons—Ethan and Charles—are felons themselves, Lee argues the condition will deprive him of the constitutional right of familial association.

### 1. Article III Delegation

"Article III judges lack constitutional authority to delegate the duty of imposing a defendant's punishment to a non-Article III judge, such as a probation officer or treatment provider." *United States v. Wagner*, 872 F.3d 535, 543 (7th Cir. 2017). At the outset, the government claims Lee did not preserve his delegation argument for appeal. We disagree. In his sentencing memorandum, Lee requested Condition No. 7 not be imposed, or, in the alternative, "that he be allowed to visit with his family *without prior approval from the probation office*." (Doc. 30 at 8, emphasis added.) He reiterated this objection at sentencing. By contesting the need to receive prior approval from the probation officer, Lee's objection went to the heart of the non-delegation rule, even if not so articulated. *See United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008) (An objection may be sufficient to preserve an appellate argument even if the objector "offers a new twist on that argument based upon additional authority on appeal."). We therefore review Lee's delegation claim *de novo. United States v. Schrode*, 839 F.3d 545, 554 (7th Cir. 2016).

To determine whether a condition of supervised release violates the non-delegation rule, "we distinguish between permissible conditions that merely task the probation officer with performing ministerial acts or support services related to the punishment imposed and impermissible delegations that allow the officer to decide the nature or extent of the defendant's punishment." *Wagner*, 872 F.3d at 543 (internal quotation marks and citations omitted). An example of a permissible, ministerial delegation would be "a condition requiring a defendant to attend treatment as approved by the probation officer" because "the court itself ordered participation in the program and only provides the probation officer authority to manage the details and supervision of the program." *Id*.

But here, the district court delegated the decision of whether Lee could associate with felons to the probation officer. The probation officer's future task, then, is not merely to manage or supervise, but to *determine* whether, when, and how a particular component of Lee's punishment—Condition No. 7—is imposed. In that sense, Lee's case mirrors *Wagner*, where we remanded based on a supervisory condition's language allowing a sex-offender-treatment provider to determine whether the defendant could access pornography. 872 F.3d at 542–43. Lee's case also aligns with *United States v. Voelker*, 489 F.3d 139 (3d Cir. 2007). The contested condition in that case prohibited the defendant from associating with minors absent the probation officer's prior approval. *Id.* at 153. The Third Circuit vacated the condition because it anointed the probation officer with "the sole authority for deciding if Voelker will ever have unsupervised contact with any minor, including his own children, for the rest of his life." *Id.* at 154.

The condition here is no different. Our colleague's separate opinion submits the probation officer cannot determine whether a condition should go into effect but can nevertheless "manage," i.e., allow, exceptions to the condition. We fail to see the functional difference. Article III does not confer upon the probation officer the authority to release a convict from a component of his or her sentence, either. The clause "unless granted permission to do so by the probation officer" violates this principle and must be stricken from Condition No. 7— only the district judge can permit or deny association. *Wagner*, 872 F.3d at 543.

We agree with our colleague that the probation officer is an authority on a supervisee's record of compliance. With that knowledge comes the ability to identify associations and settings that jeopardize a supervisee's progress. But the same expertise does not supply Article III power. Still, our decision today does not remove the probation officer's insight from the equation. If Lee requests to communicate with Ethan and Charles following his release, the district judge may (and should) invite the probation officer to present the necessary evidence and make a recommendation. With the officer's input in hand, the judge "can properly exercise [her] authority to determine whether such punishment is necessary to serve the principles and goals of supervised release." *Id.* We vacate and remand this condition for reassessment.[6]

---

[6] We understand district judges impose associational restrictions like the one here routinely, often allowing defendants to seek exceptions from their probation officers. And we recognize our holding today conflicts with our rejection of a similar delegation challenge in *United States v. Armour*, 804 F.3d 859, 870 n.3 (7th Cir. 2015), which the government cites. But we decided *Armour* without the benefit of our later analysis in *Schrode*

### 2. Familial Association

We are sympathetic to Lee's second concern, and it is a serious one. The liberty interest he raises—a parent's right to enjoy the companionship of his children—"is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).[7] And in no way do we diminish Lee's liberty interest by commenting that his situation is both rare and unfortunate when it comes to family relationships. According to the PSR, Ethan is serving three concurrent sentences in Illinois for possession of methamphetamine. His expected release date is November 2021. Charles is serving an eighteen-year sentence in Illinois for aggravated delivery of methamphetamine. His projected release date is March 2026. (PSR ¶ 65.) Fortunately for Lee, he enjoys a good relationship with his youngest son, Zander, who has maintained regular contact with and visited Lee in

---

(2016) and *Wagner* (2017). These two subsequent opinions make clear that decisions of *whether* to enforce certain components of a sentence cannot be delegated to the probation officer. Probation officers cannot grant permission to associate when a condition of supervised release bars association otherwise. Only Article III judges can make that call.

[7] Ethan and Charles, however, are not minors—they were both 23 years old as of November 2018. (PSR ¶ 65.) Query whether their age detracts from Lee's claimed liberty interest. *See Russ v. Watts,* 414 F.3d 783, 788 (7th Cir. 2005) (Observing several circuits have been "reluctant to extend the constitutional protections afforded the parent-child relationship to cases involving adult children."). While we declined in *Russ* to "impose an absolute rule that parents of adult children lack any liberty interest in their relationship with their children," we nonetheless stated, "minor children's need for the guidance and support of their parents warrants sharply different constitutional treatment." *Id.* at 790 (internal quotation marks and citations omitted).

prison. We hope Ethan and Charles will do the same once their prison terms end, although that could depend in part on their own conditions of supervision.

Still, Lee's concern is too prospective for us to address at this juncture. Lee received a sentence of 210 months' imprisonment (seventeen and a half years) and his terms of supervision will not take effect until his release. *See United States v. Kappes*, 782 F.3d 828, 859 (7th Cir. 2015) (holding claimed violation of right to familial association imposed by supervision terms not yet ripe in light of twenty-year sentence). A lot can happen during that time. *See id.* at 838 (recommending district judges reassess defendants' conditions of supervision on the eve of release from prison; "A defendant may change substantially during a long prison sentence, and the world outside the prison walls may change even more."); *United States v. Siegel*, 753 F.3d 705, 708 (7th Cir. 2014) ("Conditions that may seem sensible at sentencing may not be sensible many years later, when the defendant is finally released from prison."). For example, Lee might rehabilitate his serious drug addiction (detailed at length in the PSR) through the Bureau of Prison's substance abuse programs such that associating with felons—especially those who are involved in drugs, like Lee's sons—no longer presents a risk of recidivism or relapse. As the PSR explains, Lee interacted with criminals as part of his offense conduct, but he only turned to dealing methamphetamine in the first place after losing his job because of his own drug use. (PSR ¶¶ 23, 118.)

Moreover, the condition Lee challenges might never threaten his liberty interest at all if the district judge grants Lee permission to interact with Ethan and Charles. By its own language, Condition No. 7 does not completely bar Lee from

associating with his sons; the judge "may allow contact … if [she] deems it appropriate; the condition is not a blanket ban." *See United States v. Llantada*, 815 F.3d 679, 685 (10th Cir. 2016) (rejecting defendant's associational rights challenge to nearly identical supervised release condition). Lee has provided no reason to believe that, with the probation officer's recommendation in hand, the judge will refuse permission to communicate or associate with Ethan and Charles. And we assume the probation officer will address requests to associate and make recommendations in a reasonable manner. *Kappes*, 782 F.3d at 857–58. At sentencing, the probation officer explained his department reviews requests to associate simply for whether the desired interaction will "generate any additional risk for noncompliance" with the conditions of supervised release. (Lee's Br. App. at 9.) Speaking hypothetically, the probation officer noted his office would grant (now, recommend granting) permission for Lee to contact Ethan and Charles if the two sons abide by their own terms of probation and supervision.

The record reflects a preference for allowing contact between Lee and his sons provided all parties are progressing in their respective rehabilitative sentences. Receiving permission to associate, therefore, is largely up to all three men. *See United States v. Edwards*, 944 F.3d 631, 637 (7th Cir. 2019) (rejecting defendant's vagueness challenge to a condition that prohibited unauthorized contact with minors because defendant gave "no reason to believe that the probation officer would refuse" permission to spend time with his minor nephew).

By declining to review Lee's constitutional challenge at this time, we do not mean a defendant can never immediately appeal a condition of supervised release following entry of

judgment. We have reviewed many such challenges, including where the terms of supervision required the defendant to submit to drug testing or to participate in sex offender treatment, or prohibited the defendant from associating with white supremacy groups or from using the internet entirely. *See United States v. Rhodes*, 552 F.3d 624, 629 (7th Cir. 2009) (collecting cases). But the conditions in those cases were definite, unlike here. The district judge must first deny a request to contact Lee's sons for any liberty interest to be implicated, and such a denial would likely flow only from Lee's or his sons' hypothetical noncompliance with their respective terms of supervision. If the judge prohibits contact between Lee and his sons down the line, Lee may bring a challenge then to assert his constitutional rights, *Llantada*, 815 F.3d at 685, and he can seek to modify his supervised release terms at any time before his supervision ends. *See* 18 U.S.C. § 3583(e)(2); *United States v. St. Clair*, 926 F.3d 386, 389 (7th Cir. 2019). Our approach here promotes efficiency over "perpetuating expensive and time-consuming appeals and resentencings … ." *United States v. Silvious*, 512 F.3d 364, 371 (7th Cir. 2008).

### III. Conclusion

For all these reasons, Condition No. 7 is VACATED and REMANDED to the district court for reconsideration consistent with this opinion. Lee's sentence is otherwise AFFIRMED.

ST. EVE, *Circuit Judge*, dissenting in part and concurring in part. I agree with my colleagues that the district court correctly calculated Shawn Lee's criminal history score and that Lee's fine did not result from any error. I disagree, however, that Lee's challenge to Condition No. 7 is prospective such that it precludes our review of Lee's argument that the condition infringes on his constitutionally protected interest in associating with his children. And while I agree with my colleagues that Supervised Release Condition No. 7 raises an issue of improper delegation of Article III power to a probation officer, in my view this is only because of this underlying constitutionally protected liberty interest. Therefore, while I also vote to vacate this condition and remand to the district court, I would do so only on the limited issue of carving out an exception to Supervised Release Condition No. 7 or providing a sufficient explanation for it. I write separately as to Section II.C to explain my views on the questions of ripeness and delegation.

First, although we have previously held that in some cases certain conditions are "too contingent to be ripe for review" at the time of appeal, *United States v. Kappes*, 782 F.3d 828, 859 (7th Cir. 2015), I do not believe this is such a case. The majority cites *United States v. Rhodes*, 552 F.3d 624 (7th Cir. 2009), as an example where we found a challenge to a supervised release condition unripe. In *Rhodes*, the defendant contested a condition that he "undergo a psychosexual evaluation and participate in an outpatient sex offender counseling program if recommended by the evaluator which may involve use of polygraph and plethysmograph examinations." *Id.* at 626. Rhodes objected to the examinations on general Fifth Amendment grounds. *Id.* This condition, though, required a number of events to bear out before there was any possible

encroachment on Rhodes's Fifth Amendment rights, namely (1) an evaluator had to recommend participation in a counseling program and (2) if that occurred, the examinations had to be utilized. We therefore held that Rhodes's objection to the examination was premature—Rhodes "may only be affected by the condition after a string of contingencies." *Id.* at 629. And in *Kappes*—another decision the majority cites—when a defendant challenged a condition banning him from communicating with all minors because he or an extended family member might have a minor child at the time of his release— we declined to direct the district court to modify the condition. *Kappes*, 782 F.3d at 859. This condition was "too contingent," we held, because the defendant did not yet have any children and received a sentence of 20 years' imprisonment at age 47, making it less likely he would have children after his release. *Id.*

The same contingencies are not at play in the condition Lee challenges today. The disputed condition will set as a default rule that Lee cannot speak with his two sons over his term of supervised release—in this case, a term of five years. Unlike the conditions challenged in *Rhodes* and in *Kappes*, nothing must first occur before that condition goes into effect: as soon as his supervised release begins, he may not speak with his (currently existing) children. The majority suggests that for this condition to impinge on Lee's constitutionally protected liberty interest, Lee would have to request to communicate with his children, and the district court would have to deny that request. I respectfully disagree that a challenge to a properly preserved condition of supervised release is premature because the court or a probation officer would first need to deny a request for an exception to the rule.

Because I do not view Lee's challenge as prospective, I would resolve it on the merits. While we review "the imposition of an objected-to condition of supervised release for abuse of discretion," "[t]he constitutionality of a condition of release is a legal determination we review de novo." *United States v. Shannon*, 851 F.3d 740, 743 (7th Cir. 2017). We further review whether the district court adequately explained a chosen condition of supervised release de novo. *Id.*

As the majority notes, Lee correctly identifies that Condition No. 7 infringes on his constitutionally protected liberty interest in associating with his children. "The Supreme Court has long recognized as a component of substantive due process the right to familial relations." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000) (citing *Prince v. Massachusetts*, 312 U.S. 158, 166 (1944); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Indeed, "parents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children." *Hodgson v. Minnesota*, 497 U.S. 417, 484 (1990) (Scalia, J., concurring in part and dissenting in part); *see also Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981) ("This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to the companionship, care, custody and management of his or her children is an important interest." (internal quotation marks and citation omitted)).

We have said before that a condition of supervised release may infringe on a constitutionally protected right or interest, but the condition must be "reasonably related to the ends of rehabilitation and protection of the public from recidivism." *United States v. Armour*, 804 F.3d 859, 870 (7th Cir. 2015)

(quoting *United States v. Sines*, 303 F.3d 793, 801 (7th Cir. 2002)). A district court must "provide some rationale for *why* it believed [a challenged condition of supervised release] would be helpful" to these ends, rather than merely state that it is so. *United States v. Canfield*, 893 F.3d 491, 496 (7th Cir. 2018). We further have explained that courts must consider the infringement "more scrupulously" when it impacts deep, personal relationships. *Sines*, 303 F.3d at 801–02.

Here, the district court did not discuss why a bar on communicating with his children would aid in Lee's rehabilitation or prevent his recidivism, and instead dismissed Lee's objection on the ground that probation would address it upon his release from custody. Given the fundamental importance of the constitutionally protected liberty interest at stake—that Lee will risk returning to prison if he communicates with his own children while on supervised release—this explanation is woefully insufficient. Accordingly, I would vacate the condition and remand to the district court to carve out a limited exception to Condition No. 7 for Lee's children, or to otherwise provide a sufficient rationale for their inclusion in the terms of the condition.

Second, the majority concludes that any condition allowing a probation officer to grant exceptions to a restriction prohibiting probationers from associating with convicted felons runs afoul of the non-delegation doctrine. As the majority recognizes, this holding contradicts our conclusion in *Armour*, where we rejected an argument that "giving the probation officer the power to determine whether Armour has permission to associate with convicted felons violates the non-delegation principle." *Armour*, 804 F.3d at 870 n. 3. *Armour* is binding law in this circuit.

In subsequent cases, we have distinguished "between permissible conditions that 'merely task the probation officer with performing ministerial acts or support services related to the punishment imposed' and impermissible delegations 'that allow the officer to decide the nature or extent of the defendant's punishment.'" *United States v. Wagner*, 872 F.3d 535, 543 (7th Cir. 2017) (quoting *United States v. Schrode*, 839 F.3d 545, 555 (7th Cir. 2016)). Probation officers frequently navigate the administration of conditions like the one Lee disputes here: they routinely and effectively manage requests from probationers about whether they can attend events like a church picnic or a neighbor's graduation party, or whether they can visit any of the numerous places where they might encounter convicted felons in their communities and beyond. This responsibility appropriately belongs in a probation officer's domain: as the probationer's supervisor, the probation officer is aware of his compliance with conditions and progress during his period of release. Only because of the magnitude of the liberty interest at stake in this case do I believe this condition is more analogous to determining the "nature or extent" of the punishment. Indeed, Lee himself only challenges the delegation on this narrow ground.

Our opinions in *Schrode* and *Wagner* do not suggest otherwise. In *Schrode*, we determined that the defendant waived his nondelegation challenge by failing to raise it before the district court. *Schrode*, 839 F.3d at 555–56. Although we did not reach the issue, we said in dicta that "a condition of sex offender treatment 'as deemed necessary by probation,'" troubled us because it delegated to a probation officer "the underlying judgment of whether the condition will be imposed at

all." *Id.* at 556. And in *Wagner*,[1] we struck down a condition that similarly allowed probation to determine "whether access to adult pornography should…be restricted or denied." *Wagner*, 872 F.3d at 543 (internal quotations omitted). These conditions are not analogous to the one presented here. Where those conditions allowed probation to determine whether they would go into effect in the first instance, the condition here permits probation solely to manage exceptions. This is properly within probation's "broad authority to manage and supervise probationers." *Schrode*, 839 F.3d at 555. Therefore, while I would also remand to the district court to strike "by the probation officer" from the text of Condition No. 7, I would limit the reach of our holding on this issue to continue to allow probation to make exceptions to conditions prohibiting interactions with known felons.

---

[1] Notably, the supervised release condition at issue in *Wagner* also implicated a constitutionally protected liberty interest. There, the defendant objected to a condition allowing a treatment provider to determine whether he could view adult pornography, which receives First Amendment protection. *Wagner*, 872 F.3d at 542 (citing *United States v. Taylor*, 796 F.3d 788, 793 (7th Cir. 2015)).